UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| MATTHEW J. GREER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No.  4:13CV1530 RWS |
| | ) | (TIA) |
| MICHAEL J. ASTRUE, | ) | |
| COMMISSIONER OF SOCIAL SECURITY, | ) | |
| | ) | |
| Defendant. | ) | |

## REPORT AND RECOMMENDATION

This matter is before the Court under 42 U.S.C. § 1383(c)(3) for judicial review of the denial of Plaintiff's application for Supplemental Security Income benefits under Title XVI of the Social Security Act.  The case was referred to the undersigned for a report and recommendation pursuant to 28 U.S.C. § 636(b).

## I.  Procedural History

On October 20, 2010, Plaintiff protectively filed an application for Supplemental Security Income, alleging that he became unable to work on September 9, 2010 due to schizoaffective disorder, depressive type, and high blood pressure.  (Tr. 12, 56, 144-52, 183)  The application was denied on February 14, 2011, after which Plaintiff requested a hearing before an Administrative Law Judge ("ALJ").  (Tr. 52-53, 56-63)  On May 9, 2012, Plaintiff testified at a hearing before the ALJ.  (Tr. 29-50)  In a decision dated June 29, 2012, the ALJ found that Plaintiff was not disabled.  (Tr. 12-23)  The Appeals Council denied Plaintiff's request for review on June 13, 2013.  (Tr. 1-3)  Thus, the decision of the Appeals Council stands as the final decision of the Commissioner.

## II.  Subjective Evidence Before the ALJ

At the hearing before the ALJ, Plaintiff was represented by counsel. Plaintiff's attorney first gave an opening statement, indicating that Plaintiff met the listings because he lived in a residential care facility and was unable to function outside of a highly supportive living arrangement. Counsel further argued that, while Plaintiff continued to use marijuana, he used it to alleviate the symptoms of schizoaffective disorder. (Tr. 31-33)

The ALJ then questioned the Plaintiff, who testified that he had been living at Lebray residential care facility for the past 7 months. He did not have a driver's license, and his caseworker, Craig Mason, drove him to the hearing. Plaintiff attended 10th grade but only completed 9th grade. He was placed in special education classes for two years during elementary school. Plaintiff had no vocational training, but he was able to read and write. Plaintiff received Medicaid benefits, and the State of Missouri paid for Plaintiff's residential care facility. Plaintiff testified that he was single and had no children. He previously worked for Colavar Landscapes for about six months in 2008. His is duties included landscaping and odd jobs such as building retaining jobs. He performed manual labor and lifted over 50 pounds but not over 100 pounds. He was fired for property damage, but Plaintiff stated he was not the culprit. (Tr. 34-37)

Plaintiff further testified that he began using marijuana when his was 13 years old. He last used about two to three months before the hearing. He had previously participated in a drug treatment program but not recently. He testified to also having used cocaine, heroin, alcohol, and prescription pain pills. He no longer used these substances. Plaintiff was questioned by police about a burglary when he was 17 years old. He also had misdemeanor charges filed against him for drugs, the most recent for marijuana possession a year prior. He stated that he

previously served time in jail and was currently serving two years' unsupervised probation which began the month before.  (Tr. 37-40)

Plaintiff's attorney also questioned Plaintiff, who testified that he previously lived at a dual diagnosis venue called Daybreak in the fall of 2010.  He went there after a hospitalization and lived there three or four months.  He left to move in with a girlfriend, but things did not work out.  Plaintiff then went to Pathways in Jefferson City, and he was charged with marijuana possession at that time.  He was hospitalized a couple times in April of 2011 but then moved away from the mid-Missouri area in June 2011.  When Plaintiff returned to the St. Louis area, he was homeless for a week, lived with his uncle for a couple months, and then lived with his aunt while waiting to get into Lebray.  Plaintiff testified that he lived at Lebray since September of 2011.  He also received treatment from doctors at BJC.  While Plaintiff stated he had not used marijuana for a few months, he was previously using two to three times a week while at the facility.  He used marijuana to help him with sleep, stress, and mood swings.  (Tr. 40-42)

Plaintiff testified that his mental health problems were a little worse when he was not using marijuana, yet some things were better.  For instance, marijuana improved his sleep, and he experienced less stress and a stable mood.  However, he heard more voices and experienced more paranoia when using.  Despite not smoking pot for a few months, Plaintiff continued to hear voices about 10 to 20 times a day.  The voices did not last for more than a couple minutes. Plaintiff also saw colors and spots that did not exist.  (Tr. 42-43)

Plaintiff further stated that the workers at the facility brought him his medications and made sure he took them.  He consistently took his medications since September of 2011 but testified to having problems taking medications in the past because he lost track of time.

Plaintiff stated that the had problems with sleeping too much during the day because he did not sleep well at night. He slept most of the day about 50 to 75 percent of the time at the residential care facility but reported sleeping a little better lately. Plaintiff had no side effects from his medication, but his attention span was pretty low on an average day. He testified that he could only pay attention for a few minutes at a time. He also experienced depression and crying spells. He believed that he would live in the residential care facility for awhile. In addition, Plaintiff testified that he previously worked for his father doing electrical work. However, Plaintiff had problems focusing and understanding instructions. He had trouble waking up in time for work, and he was irritable due to the stress of working. (Tr. 43-46)

A vocational expert ("VE"), James Israel, also testified at the hearing. The VE stated taht Plaintiff's prior job as a construction worker involved heavy strength and semi-skilled work. Plaintiff did not work for his father long enough to acquire any skills. The ALJ then asked the VE to assume an individual of Plaintiff's age, education, and work experience who did not have any exertional, postural, manipulative, environmental, or visual limitations. However, the individual was limited to occupations that did not require written communication. Further he was limited to work involving only one or two step tasks. The jobs needed to involve minimal stress, which required only occasional decision making; occasional changes in the work setting; no interaction with the public; no interaction with co-workers; only casual contact with co-workers; and contact with supervisory staff when work duties are being performed up to expectations occurring no more than three times per workday. Given these limitations, the VE testified that the individual could not perform Plaintiff's past job because construction duties involved more complex steps and interaction with co-workers. However, the individual could

perform other jobs in the national and local economy, including bulk packer, metal assembler, ad sorter. In these occupations, employers typically tolerated no more than one unexcused or unscheduled absence per month. Sometimes the third tardiness or absence would trigger the loss of a job. (Tr. 46-49)

Plaintiff's attorney also questioned the VE, asking whether an individual who was unable to concentrate for three minutes at a time, 10 to 20 times per day, was able to perform the work the VE identified. The VE responded that such person would be unable to maintain employment due to the interruptions and regrouping time needed. Additionally, if the individual missed work half the month because of symptoms, he would not be able to sustain work. (Tr. 49-50)

On November 15, 2010, Plaintiff completed a Function Report – Adult. He reported that he resided at a treatment center and spent his days eating, going to group sessions, and bathing. He did not have any problems with personal care but did report that he had difficulty sleeping and did not want to eat. Further, Plaintiff needed reminders to brush his teeth, bathe, shave, take care of himself, and take his medications. He did not prepare his own meals except cereal for breakfast. Plaintiff was able to do laundry, mow the grass, clean, and perform repairs. He also shopped for food and clothing every couple of weeks. He could not pay bills or handles a savings account. He enjoyed spending time with others every day and went to Wal-Mart on a regular basis. However, he also reported that he had trouble being around groups and also had an anger problem. His conditions affected his ability to squat, bend, kneel, hear, remember, complete tasks, concentrate, understand, follow instructions, and get along with others. Plaintiff opined that he could walk one mile before needing to rest for 10 minutes. He could only pay attention for one minute, and he did not follow written or spoken instructions very well.

Additionally, he did not get along with authority figures very well except when he had to . He was able to handle changes in routine. (Tr. 200-07)

Plaintiff's father also completed a Function Report Adult – Third Party, stating that Plaintiff seemed distant, depressed, and unmotivated. He was moody and cried. Plaintiff was able to prepare his own meals and could perform any chores. When Plaintiff was motivated, he was a good worker. When he was depressed, he was not a good worker. Plaintiff's father further reported that Plaintiff enjoyed watching TV, hanging out, and drum circles. He had no problems getting along with others, but he always slept and did not engage in life. His conditions affected his ability to understand, follow instructions, complete tasks, get along with others, and concentrate. However, he was able to finish what he started and followed instructions well. He got along well with authority figures but had been fired from a job because his boss disrespected him. Plaintiff's father stated that Plaintiff was in a good place now and seemed well. (Tr. 224-31)

Plaintiff's case manager, Meghan Devine, completed a Function Report as well, noting that she interacted with Plaintiff about one to two hours daily at Daybreak residential care facility. A typical day involved cooking breakfast, attending group sessions, watching TV, drawing, attending therapy, and reading. Ms. Devine reported that Plaintiff cooked himself a simple breakfast of eggs and toast, and he cooked meals for other clients at Daybreak. Plaintiff also did laundry, vacuumed, cleaned the bathroom, and took out trash. He was able to shop for food and clothing. However, Plaintiff could not pay bills or have a savings account because he had no income. He could not work due to mental illness. Plaintiff enjoyed drawing, watching TV, and listening to music. Plaintiff did not spend time with others because he heard voices and

experienced increased anxiety. He went to Wal-Mart once a week, and he wanted to attend church and community support meetings but was too anxious in the crowds. Ms. Devine stated that Plaintiff struggled to be social due to auditory hallucinations and anxiety. He isolated himself and did not go out of the house much. His conditions affected his ability to understand, hear, follow instructions, get along with others, and concentrate. He could walk a mile and pay attention for 10 minutes. He could follow written instructions fairly well but could not follow spoken instructions due to forgetfulness or lack of motivation. He seemed to get along okay with authority figures. Further, he was not stressed often, but stress heightened his psychotic symptoms. (Tr. 232-39)

### III. Medical Evidence

On September 7, 2010, Plaintiff was admitted to the Hyland Behavioral Health Center in St. Louis, Missouri with the diagnoses of schizophrenia, depression, and polysubstance abuse. Plaintiff reported hearing voices daily. Physical examination was normal. Mental status exam revealed decreased psychomotor activity, slow and monotonous speech that was tangential and circumstantial at times. Plaintiff stated that he smoked marijuana almost every day and had used heroin for two months. He had been clean for six months. Plaintiff also reported a history of cocaine use; however, he last used a few months ago. Plaintiff had been living from place to place and sleeping on the street at times. While hospitalized, Plaintiff was treated with individual and group therapy. Plaintiff still had some psychotic symptoms upon discharge, but he insisted on going to the dual diagnosis unit. Plaintiff was discharged to a facility called Daybreak in Columbia, Missouri on September 16, 2010, and Dr. Rashid Zia noted that, while Plaintiff was safe for discharge, he could have benefitted from a longer stay. (Tr. 264-267)

On October 18, 2010, a Licensed Clinical Social Worker diagnosed Plaintiff with cannabis dependence; alcohol abuse; opioid dependence – partial remission; substance induced psychotic disorder with hallucinations; and substance induced mood disorder, R/O schizoaffective disorder – depressive type. Plaintiff's Global Assessment Functioning ("GAF") over the past year was 35, with a current GAF of 32. Plaintiff stated he wanted to get clean and learn how to deal with his mental health issues without using. (Tr. 311, 339)

Psychiatric Case Notes from October 21, 2010 revealed a history of poly substance dependence and schizoaffective disorder. Plaintiff displayed symptoms of crying spells, hopelessness, worthlessness, and helplessness, as well as social phobia, muscle tension, and command psychosis. Mental Status Exam was essentially normal, although Plaintiff reported auditory hallucinations. Plaintiff requested Abilify. The examining psychiatrist assessed a GAF of 35 and advised Plaintiff to follow up in 2 months. (Tr. 337-38)

On November 4, 2010, psychiatric notes indicated that Plaintiff continued to hear voices telling him that he will never stay clean. Plaintiff also complained of anxiety with tightening muscles. He reported that the medications helped, but not enough. Mental status exam was normal. The psychiatrist increased Plaintiff's Abilify dose and added Prozac. (Tr. 292)

Progress notes from Daybreak Community Support on November 29, 2010 noted that Plaintiff was attentive and appropriate, and he continued to work on treatment goals. He planned to attend GED classes and inquire about a volunteer job with Habitat for Humanity. (Tr. 352)

On January 6, 2011, Plaintiff's psychiatrist noted that Plaintiff was feeling good that day. The voices had diminished some, and Plaintiff reported no side effects from medication. (Tr.

335)

A psychiatric evaluation performed on January 20, 2011 indicated that Plaintiff was not feeling good that day. He felt stressed and sick to his stomach. Plaintiff reported that he was unable to tolerate Vistaril due to an upset stomach and that Buspar was not really helping. His medications included Abilify, Trazodone, Buspar, and Lexapro. The psychiatrist increased Plaintiff's Buspar dose and recommended relaxation therapy. (Tr. 334)

On February 14, 2011, Deborah Doxsee, Ph.D., completed a Mental Residual Functional Capacity Assessment. Dr. Doxsee opined that Plaintiff was moderately limited in his ability to understand and remember detailed instructions; the ability to carry out detailed instructions; the ability to maintain attention and concentration for extended periods; the ability to sustain an ordinary routine without special supervision; the ability to interact appropriately with the general public; the ability to accept instructions and respond appropriately to criticism from supervisors; the ability to respond appropriately to changes in the work setting; and the ability to set realistic goals or make plans independently of others. (Tr. 385-87) Consultant's notes from Dr. Doxsee indicate that Plaintiff's allegations were only partially credible, as his allegations were internally inconsistent and not supported by the record. Dr. Doxsee opined that while Plaintiff's limitations were more than non-severe, the limitations did not equal or equate to a listing. (Tr. 399)

Nurse Practitioner Annette McDonald evaluated Plaintiff on March 29, 2011 at the University of Missouri Hospital Psychiatric Inpatient Clinic. She noted a history of schizoaffective disorder, bipolar depressive type, and polysubstance abuse presenting with suicidal ideation. Plaintiff reported that he had recently spent five months in Daybreak

Treatment program for heroin, pain pills, and marijuana but that he quit the program one to two months early because he could not deal with the anxiety. His anxiety was so bad that he would become physically sick with nausea and vomiting and could not sleep, and he attributed the anxiety to having to deal with the other people in the program. Plaintiff further reported being clean since leaving, but he was concerned that his girlfriend telling him to move out triggered his depression and suicidal ideation. He was also concerned he would start using drugs again. Plaintiff indicated that had been sleeping 16 hours per night and had decreased interest in drawing and painting, decreased energy, and trouble concentrating. He often heard voices inside of his head. In addition to his depression, Plaintiff reported that he experienced a manic episode the day before causing a surge of energy and sleeplessness. He also had visual hallucinations at night. Plaintiff had been clean since beginning rehab six months ago, and his drug screen tested negative. Nurse McDonald assessed schizoaffective disorder, depressed, moderate; a recent history of polysubstance abuse; and a GAF of 45. Plaintiff was willing to wait for an inpatient bed at MUPC. (Tr. 420-27)

Dr. Muaid Hilmi Ithman completed a discharge summary from the University Hospital's Psychiatric Inpatient Unit on April 13, 2011. Dr. Ithman noted that Plaintiff was admitted to the hospital on March 29, 2011, and discharged on April 1, 2011. Plaintiff was diagnosed with cannabis dependence in remission; opioid dependence in remission; hallucinogen dependence in full remission; alcohol abuse; psychosis, not otherwise specified; and antisocial personality disorder. Plaintiff's admission GAF was 45, and his GAF on discharge was 55. Dr. Ithman noted that Plaintiff was discharged to Pathways Transitional Program in Jefferson City, Missouri. His mood was fine, and he reported only very minimal voices that were not bothering

him.  He denied suicidal or homicidal thoughts, and his insight and judgment were fair.  (Tr. 415-19)

Plaintiff presented to the University of Missouri Hospital Psychiatrist Inpatient Unit for emergency services on April 24, 2011.  Plaintiff was found with marijuana in his possession while residing at Pathways.  He was taken into police custody, during which time he stated that he was tired of living and wanted to kill himself.  Plaintiff reported having suicidal thoughts and plans, as well as hearing voices.  He had been taking his medications as directed. Plaintiff's drug screen was positive for amphetamines and cannabinoids.  Mental status examination revealed limited eye contact; slow and monotone speech; depressed mood; and flat affect.  He endorsed suicidal ideations but denied homicidal ideations. In addition, he reported auditory hallucinations and visual hallucinations of colors and spots. His insight and judgment were impaired.  Allen Lavender, D.O., assessed substance-induced mood disorder; psychosis NOS; cannabis dependence; amphetamine abuse; history of alcohol abuse; and a GAF of 37. (Tr. 406-09)

Plaintiff was discharged from the University of Missouri Psychiatric Inpatient Unit on April 28, 2011 with a diagnosis of cannabis dependence; amphetamine abuse; mood disorder, not otherwise specified; psychotic disorder, not otherwise specified; malingering; history of polysubstance dependence in partial early remission; history of schizoaffective disorder, per the patient's report; antisocial personality disorder; and a GAF of 50.  Plaintiff admitted to making suicidal statements to get out of jail.  He was discharged back to the care of Pathways with medications.  Plaintiff's discharge condition was good, and he noted that the auditory hallucinations did not bother him so much at that time.  (Tr. 402-04)

Plaintiff was admitted to the Hyland Behavioral Health Center at St. Anthony's

Medical Center in St. Louis, Missouri on May 24, 2011. He presented with depression, paranoia, and suicidal ideation. Intake notes indicate that he needed his meds to be adjusted. Plaintiff reported being suicidal the past five days. Clinical impressions at the time of admission were schizoaffective disorder, depressed; cannabis abuse; and a GAF of 20. Plaintiff's attending physician was Dr. Sofia Grewal. (Tr. 433-39, 447)

On May 26, 2011, the psychiatric technician noted that Plaintiff reported hearing voices. He was paranoid and felt people were against him. He isolated himself in his room and had flat, sad, blunted affect. He was inconsistent and disorganized. (Tr. 465) On May 27, 2011, Plaintiff was pleasant, calm, cooperative, and out of his room. He was present for activities but did not participate. Plaintiff was released that day. (Tr. 473, 479)

Plaintiff was admitted to BJC Behavioral Health on July 25, 2011, with a diagnosis of schizoaffective disorder and a GAF of 55. On August 4, 2011, Rachel Morel, M.D., performed a psychological evaluation. She advised that no changes should be made to Plaintiff's medications at that time. She counseled Plaintiff at length about his drug and alcohol abuse and how that negatively affected his mental health. Plaintiff declined any inpatient rehab program, so he was admitted to outpatient care. (Tr. 480-82)

On August 23, 2011, a clinical summary performed at BJC Behavioral Health revealed that Plaintiff felt sad or seemed irritable for no apparent reason. He also reported feelings of worthlessness, hopelessness, and discouragement about his life. He lost interest in things that were previously pleasurable such as reading and drawing, and his mood sometimes changed quickly from happy to sad, irritable, or angry. His thinking and speaking could become so fast that he interrupted everyone, including himself. Plaintiff sought a psychiatrist, vocational

rehabilitation, and assistance with the residential care facility.  Plaintiff reported last using marijuana the day before admission.  He also stated that he was a binge drinker.  Plaintiff was admitted with a diagnosis of schizoaffective disorder, polysubstance dependence, and a GAF of 60.  In addition, the examiner, Gloria Jourdan, MSW, LCSW, noted that until Plaintiff wanted to honestly work to quit his substance abuse, his mental health was unlikely to substantially improve.  (Tr. 484-85, 494-501)

On September 1, 2011, Plaintiff agreed to try a mood stabilizer to help with his impulsivity.  He reported that he stole from his uncle to pay for drugs.  He last used marijuana two days prior.  In addition, Plaintiff had not taken his prescribed medications for 2 to 3 weeks.  He reported not having much anxiety since stopping the medication, and he no longer wanted to take an antidepressant.  Dr. Morel prescribed Abilify, Trazadone, and Depakote.  Dr. Morel also encouraged Plaintiff to undergo inpatient rehab, as being clean was a way to find out if there was an underlying thought or mood disorder. (Tr. 505-07)

On September 15, 2011, Plaintiff reported some improvement since the last visit. He noticed some hypomania right before he took Depakote at bedtime. He had less impulsivity during the day and was not overly sedated.  However, he reported some paranoia when around others because he thought people were following him either in cars or on foot. He was having trouble sleeping and Trazodone was causing restlessness. He had not had marijuana for the past two weeks.  (Tr. 508)

On September 29, 2011, Plaintiff reported some improvements since the last visit.  His visual and audiological hallucinations had decreased in severity and frequency but were still there.  In addition, Plaintiff's paranoia had decreased, but it was still present.  He had recently

become more depressed as one of his friends had died in the last year, and he did not know about it because he was trying to stay away from that friend in order to stay clean. Plaintiff had not used marijuana or any drug for over a month. He was trying to stay away from illegal drugs so his medications could work effectively. (Tr. 511)

Dr. Morel noted on November 30, 2011 that Plaintiff had gone to rehab for two weeks and relapsed shortly after leaving. He had been clean and sober for two weeks and was trying very hard to stay away from marijuana. However, he reported that he was more agitated and angry since he stopped using marijuana. He was not sleeping at night and felt that the Rozerem was ineffective. Plaintiff denied auditory and visual hallucinations or paranoia. He reported that therapy was effective. Plaintiff's speech was decreased in rate and volume, and his affect was restricted. Dr. Morel assessed schizoaffective disorder ("SAD"), polysubstance dependence, and a GAF of 45. Dr. Morel prescribed Seroquel and advised Plaintiff to continue other medications at current dosages. (Tr. 515)

On January 10, 2012, Sarah Walsh, an occupational therapist, wrote a letter indicating that Plaintiff had resided at Peter and Paul Community Services' Labre Center since September 21, 2011. While living there, Plaintiff had worked with a nurse, social worker, occupational therapist, and substance abuse counselor to improve his independent living skills and work toward achieving his goals. These goals included managing his medications, medical condition, and appointments; establish and maintaining sobriety; improving independent living skills (e.g., nutritious cooking, developing a routine schedule, money management); obtaining his GED; engaging in leisure and vocational pursuits; and moving to independent housing. Plaintiff was eligible to continue living at Labre Center and participate in services through September 20,

2013. (Tr. 401)

Plaintiff returned to Dr. Morel on January 23, 2012, and he reported feeling stressed out because his RCF wanted him to get his GED yet accused him of abusing marijuana because of his friends. Plaintiff also reported trouble sleeping. Dr. Morel assessed continued trouble with mood and psychosis and increased Plaintiff's Depakote ER to help with mood and psychosis as well as sleep. Dr. Morel diagnosed SAD, polysubstance dependence, and a GAF of 45. (Tr. 516)

Dr. Leigh Brown, a psychiatrist, performed a psychiatric evaluation on February 22, 2012. Dr. Brown noted Plaintiff's diagnoses of schizoaffective disorder, depressed type and polysubstance dependence. Dr. Brown further noted that Dr. Morel previously treated Plaintiff but that Plaintiff was switching his care because Dr. Morel left this location. Plaintiff's chief complaints were schizophrenia, hearing voices in his sleep, and his bipolar. Dr. Brown opined that the course of Plaintiff's illness was complicated by drug use and noted that Plaintiff had been hospitalized four times in the past two years secondary to suicidal ideations. It was noted that the Plaintiff had been first seen by BJC Behavioral Health nine months prior. Plaintiff had been prescribed a number of medications for sleep, depression, and paranoia. He reported a history of depression characterized by amotivation, increased appetite, increased sleep, and persistent feelings of helplessness and worthlessness with suicidal ideations. He stated that he experienced sleep problems, but Dr. Brown noted Plaintiff slept soundly from 1:00 a.m. to 9:00 a.m. Plaintiff reported feeling mostly stable over the past several months. However, he still heard voices, although they were inside his head as opposed to outside his head, and they were not overly bothersome. Dr. Brown continued Plaintiff's medications and advised him to engage in physical activity during the day. (Tr. 517-21)

On February 27, 2012, Dr. Rachel Morel answered Interrogatory Questions. She noted that Plaintiff was in a residential care facility and would be residing in that facility over the next year. Dr. Morel agreed that the highly supportive environment of living in a residential care facility helped to reduce Plaintiff's symptoms. Dr. Morel opined that Plaintiff's ability to function was fair in all areas of making occupational adjustments. In addition, Dr. Morel indicated that Plaintiff had poor to no ability to understand, remember, and carry out complex job instructions and detailed, but not complex, job instructions. He had a fair ability to understand, remember, and carry out simple job instructions. Dr. Morel explained that Plaintiff was improved with medications but that thought organization and comprehension were still an issue. (TR 414) Further, Dr. Morel noted that Plaintiff had only a fair ability to demonstrate reliability, reasoning that Plaintiff's organization issues could lead to missed days of work. (Tr. 413-14)

On March 21, 2012, Plaintiff reported feeling more paranoid lately. Plaintiff was trying to study for his GED but was having difficulties because he still heard voices inside his head. There was also a warrant out for his arrest. Dr. Brown noted that Plaintiff's mood had been stable and that he did not seem to have true paranoia. Dr. Brown also questioned whether Plaintiff had been using substances. (Tr. 521-24)

### IV. The ALJ's Determination

In a decision dated June 29, 2012, the ALJ found that Plaintiff had not engaged in substantial gainful activity since October 20, 2010, the date he filed his application. Plaintiff had the severe impairments of cannabis dependence, alcohol abuse, opioid dependence, substance-induced psychotic disorder, and schizoaffective disorder. In addition, the ALJ found that

Plaintiff's impairments, including the substance abuse disorders, met sections 12.03, 12.04, and 12.09 of 20 C.F.R. Part 404, Subpart P, Appendix 1. If Plaintiff stopped the substance abuse, the remaining limitations would cause more than a minimal impact on Plaintiff's ability to perform basic work activities. Thus, Plaintiff would continue to have a severe impairment or combination of impairments. However, if the Plaintiff stopped the substance use, he would not have an impairment or combination of impairments that met or medically equaled any of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Tr. 12-18)

The ALJ determined that if Plaintiff stopped the substance use, he would have the residual functional capacity ("RFC") to perform a full range of work at all exertional levels with certain nonexertional limitations. The ALJ noted that Plaintiff was limited to work that involved only simple, routine, and repetitive tasks with no written communication. Further, he needed a low stress job which required only occasional decision making and only occasional changes in the work setting; no interaction with the public; only casual and infrequent contact with co-workers; and contact with supervisors concerning work duties, when those duties are performed satisfactorily, occurring no more than three times per workday. The ALJ found that if Plaintiff stopped the substance use, he would be unable to perform his past relevant work. In light of Plaintiff's younger age, limited education, work experience, and RFC, the ALJ determined that, if he stopped the substance use, a significant number of jobs in the national economy existed which Plaintiff could perform. Such jobs included bulk packer, metal assembler, and sorter. The ALJ found that Plaintiff's substance use disorder was a contributing factor material to the determination of disability because Plaintiff would not be disabled if he stopped the substance use. Because substance use disorder was a contributing factor, the ALJ

concluded that Plaintiff had not been disabled within the meaning of the Social Security Act at any time from the date the application was filed through the date of the decision. (Tr. 18-23)

### V. Legal Standards

A claimant for social security disability benefits must demonstrate that he or she suffers from a physical or mental disability. 42 U.S.C. § 423(a)(1). The Social Security Act defines disability as "the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period not less than 12 months." 42 U.S.C. § 423(d)(1)(A).

To determine whether a claimant is disabled, the Commissioner engages in a five step evaluation process. See 20 C.F.R. § 416.920(a)(4)(i)-(v). Those steps require a claimant to show: (1) that plaintiff is not engaged in substantial gainful activity; (2) that she has a severe impairment or combination of impairments which significantly limits her physical or mental ability to do basic work activities; or (3) she has an impairment which meets or exceeds one of the impairments listed in 20 C.F.R., Subpart P, Appendix 1; (4) she is unable to return to her past relevant work; and (5) her impairments prevent her from doing any other work. Id.

The Court must affirm the decision of the ALJ if it is supported by substantial evidence. 42 U.S.C. § 405(g). "Substantial evidence 'is less than a preponderance, but enough so that a reasonable mind might find it adequate to support the conclusion.'" Cruse v. Chater, 85 F. 3d 1320, 1323 (8th Cir. 1996) (quoting Oberst v. Shalala, 2 F.3d 249, 250 (8th Cir. 1993)). The Court does not re-weigh the evidence or review the record de novo. Id. at 1328 (citing Robinson v. Sullivan, 956 F.2d 836, 838 (8th Cir. 1992)). Instead, even if it is possible to draw two different conclusions from the evidence, the Court must affirm the Commissioner's decision if it is supported by

substantial evidence. Id. at 1320; Clark v. Chater, 75 F.3d 414, 416-17 (8th Cir. 1996).

To determine whether the Commissioner's final decision is supported by substantial evidence, the Court must review the administrative record as a whole and consider: (1) the credibility findings made by the ALJ; (2) the plaintiff's vocational factors; (3) the medical evidence from treating and consulting physicians; (4) the plaintiff's subjective complaints regarding exertional and non-exertional activities and impairments; (5) any corroboration by third parties of the plaintiff's impairments; and (6) the testimony of vocational experts when required which is based upon a proper hypothetical question that sets forth the plaintiff's impairment(s). Stewart v. Secretary of Health & Human Servs., 957 F.2d 581, 585-586 (8th Cir. 1992); Brand v. Secretary of Health Educ. & Welfare, 623 F.2d 523, 527 (8th Cir. 1980).

The ALJ may discount plaintiff's subjective complaints if they are inconsistent with the evidence as a whole, but the law requires the ALJ to make express credibility determinations and set forth the inconsistencies in the record. Marciniak v. Shalala, 49 F.3d 1350, 1354 (8th Cir. 1995). It is not enough that the record contain inconsistencies; the ALJ must specifically demonstrate that he or she considered all the evidence. Id. at 1354; Ricketts v. Secretary of Health & Human Servs., 902 F.2d 661, 664 (8th Cir. 1990).

When a plaintiff claims that the ALJ failed to properly consider subjective complaints, the duty of the Court is to ascertain whether the ALJ considered all of the evidence relevant to plaintiff's complaints under the Polaski[1] standards and whether the evidence so contradicts plaintiff's

_____

[1]The Polaski factors include: (1) the objective medical evidence; (2) the subjective evidence of pain; (3) any precipitating or aggravating factors; (4) the claimant's daily activities; (5) the effects of any medication; and (6) the claimants functional restrictions. Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984).

subjective complaints that the ALJ could discount his testimony as not credible. Benskin v. Bowen, 830 F.2d 878, 882 (8th Cir. 1987). If inconsistencies in the record and a lack of supporting medical evidence support the ALJ's decision, the Court will not reverse the decision simply because some evidence may support the opposite conclusion. Marciniak, 49 F.3d at 135.

## VI. Discussion

The Plaintiff argues that substantial evidence does not support the ALJ's determination that, Plaintiff did not have a disability that met part C of listing 12.03. Plaintiff also contends that the hypothetical question posed to the VE did not accurately portray the Plaintiff's RFC. The Defendant, on the other hand, asserts that the ALJ properly found Plaintiff's impairments did not meet or equal a listing in the absence of substance use. Defendant also contends that substantial evidence supports the ALJ's RFC determination in the absence of substance use.

### A. Listing 12.03(C) and Substance Use

Plaintiff first argues that substantial evidence does not support the ALJ's decision that Plaintiff did not meet Listing 12.03(C) in the absence of substance. Defendant maintains that the ALJ properly determined that without substance use, there was no evidence that Plaintiff would experience episodes of decompensation when sober, would decompensate if he experienced minimal increases in mental demands or a change in environment, or that Plaintiff could not function outside of a "highly supportive living arrangement." The undersigned agrees that Plaintiff's impairments would not meet the requirements of Listing 12.03, subsection C, in the absence of substance use such that substantial evidence supports the ALJ's determination.

Under Eighth Circuit law, "if alcohol or drug abuse comprises a contributing factor material to the determination of a disability, the claimant's application must be denied. . . . 20

C.F.R. § 404.1535." Brueggemann v. Barnhart, 348 F.3d 689, 693 (8th Cir. 2003). However,

the ALJ must follow the correct procedures for making this determination which includes (1)

evaluating whether the plaintiff would still be disabled if he stopped using drugs or alcohol and

(2) evaluating which limitations would remain if plaintiff stopped using drugs or alcohol and

determining whether the remaining limitations would be disabling.[2] Id. at 693 n.2. This

determination, requires that the ALJ base the "disability determination on substantial evidence of

[plaintiff's] medical limitations without deductions for the assumed effects of substance abuse

disorders. The inquiry here concerns strictly symptoms, not causes[.]" Id. at 694. The Plaintiff

has the burden of proving that his substance abuse is not a contributing factor material to his

alleged disability. Estes v. Barnhart, 275 F.3d 722, 725 (8th Cir. 2002). "However, the ALJ

retains the responsibility of developing a full and fair record in the non-adversarial

administrative proceeding." Brueggemann, 348 F.3d at 693.

     In the instant case, substantial evidence supports the ALJ's determination that substance

use was a contributing factor material to the determination of disability such that Plaintiff did not

meet the criteria of Listing 12.03(C). The ALJ followed the proper procedures and found first

that Plaintiff's cannabis dependence, alcohol abuse, opioid dependence, substance-induced

psychotic disorder, and schizoaffective disorder met sections 12.03, 12.04, and 12.09 of the

---

     [2] The court in Brueggemann sets forth the proper procedure for determining substance
abuse related claims. The ALJ must first determine whether the plaintiff is disabled without
deductions for the effects of substance abuse. If the gross total of the plaintiff's limitations
shows disability, the ALJ must next consider which limitations would remain when the effects of
substance use were absent. Only after determining that the plaintiff is disabled, that drug or
alcohol use is a concern, and that substantial evidence shows the remaining limitations in the
absence of substance use, may the ALJ determine whether substance use disorders are a
contributing factor material to the disability determination. 348 F.3d at 694-95.

Listings. (Tr. 14) The ALJ next determined that, without considering the effects of substance use, under part C of 12.03 there was "no evidence to show that the claimant has had any episodes of decompensation while sober, nor is there any evidence in the record to show he would decompensate if he experienced minimal increases in mental demands or a change in environment. He would also be able to function outside of a 'highly supportive living arrangement.'" (Tr. 18) Finally, the ALJ found that Plaintiff's schizoaffective disorder, absent substance use, did not meet a listing and that she retained the RFC to perform work-related activity. (Tr. 18-21)

Listing 12.03 pertains to schizophrenic, paranoid and other psychotic disorders characterized by the onset of psychotic features with deterioration from a previous level of functioning. Part C requires a medically documented history of at least 2 years' duration that causes more than a minimal limitation of ability to do basic work activities, along with either repeated episodes of decompensation, each of extended duration; a residual disease process that would cause decompensation with even a minimal increase in mental demands or change in environment; or a current history of an inability to function outside a highly supportive living arrangement for 1 or more years. 20 C.F.R. 404 Subpt. P, App. 1, §12.03(C).

Plaintiff argues that the ALJ erroneously found that no evidence showed Plaintiff had any episodes of decompensation while sober. Plaintiff points to his admission to the University of Missouri Hospital psychiatric unit in 2011. He asserts that he had been clean for six months when admitted with suicidal ideation and auditory hallucinations. However, the Defendant correctly notes that the Listings define episodes of decompensation, each of extended duration, as "three episodes within 1 year, or an average of once every 4 months, each lasting for at least 2

weeks." 20 C.F.R. 404 Subpt. P, App. 1, §12.00 (C)(4). Plaintiff refers to only one incident of decompensation while Plaintiff was sober. The other hospitalizations during the relevant time period lasted less than two weeks and involved substance use. (Tr. 264, 402, 456) Thus, the medical evidence does not support Plaintiff's contention that he met Listing 12.03 due to repeated episodes of decompensation, each of extended duration.

Likewise, substantial evidence supports the ALJ's finding that Plaintiff would not decompensate if he experienced minimal increases in mental demands or a change in environment. Plaintiff's treating psychiatrist, Dr. Morel, opined that without substance abuse Plaintiff had a fair ability to make occupational adjustments and to understand, remember, and carry out simple job instructions, meaning serious limitations but not precluded. (Tr. 413-14) Further, Plaintiff had good ability to maintain personal appearance, behave in an emotionally stable manner, and relate predictably in social situations. Dr. Morel indicated that Plaintiff was improved with medications. (Tr. 414) In addition, as stated by the ALJ, Dr. Doxsee noted that Plaintiff could perform simple tasks and interact adequately with peers and supervisors when not using substances. (Tr. 20, 385-87) Indeed, the ALJ noted, and the record demonstrates, that Plaintiff was able to perform multiple tasks, including shopping at Wal-Mart. (Tr. 17, 19, 200-04) In short, nothing in the record demonstrates that Plaintiff would decompensate with minimal increases in mental demands or environmental changes. Thus, substantial evidence supports the ALJ's finding that Plaintiff does not meet the listing based on this criteria.

Finally, substantial evidence supports the ALJ's determination that Plaintiff could function outside of a "highly supportive living arrangement." Plaintiff argues that Dr. Morel's interrogatory answers inferred that Plaintiff's symptoms would be more severe if he was not

living in a highly supportive living arrangement. While Dr. Morel noted that a highly supportive environment of living in a residential care facility helped reduce Plaintiff's symptoms, her opinions regarding Plaintiff's ability to make occupational adjustments were based upon Plaintiff's ability to do work-related activities on a day-to-day basis in a regular work setting. (Tr. 413)

Plaintiff also contends that the ALJ ignored the opinion of Plaintiff's occupational therapist, Sarah Walsh. Ms. Walsh indicated that Plaintiff lived at Labre Center and relied on a nurse, social worker, occupational therapist, and substance abuse counselor to improve his independent living skills. She also noted that Plaintiff was eligible to continue living at Labre through September 20, 2013. The ALJ acknowledged Plaintiff's living situation in the opinion. (Tr. 15) While Ms. Walsh described Plaintiff's living arrangements and treatment plan, she did not provide an opinion regarding his ability to function. (Tr. 401) Indeed, the letter suggests that Plaintiff was gaining skills in order to live and function independently, not to remain in a highly supportive living environment. (Tr. 401) In addition, while Dr. Morel noted that a highly supportive environment of living helped reduce Plaintiff's symptoms, nothing in her interrogatory answers or in her treatment notes indicates that Plaintiff required such a living environment when sober. (Tr. 412) The ALJ noted that Dr. Morel's opinion about Plaintiff's living arrangement failed to indicate anything dispositive of Plaintiff's need for a structured care facility. (Tr. 20) Further, Dr. Morel questioned whether Plaintiff suffered from a mental illness or if his impairments were all substance related.[3] (Tr. 507) Thus, the undersigned finds that

---

[3] Plaintiff contends that the ALJ erred in attributing a statement to Dr. Morel that the social worker, Gloria Jourdan, actually made. Ms. Jourdan opined that until Plaintiff honestly worked to quit substance abuse, his mental health would likely not substantially improve, and the

substantial evidence supports the ALJ's determination that Plaintiff did not meet the criteria of Listing 12.03(C) absent substance use.

## B. The ALJ's RFC Determination

Plaintiff also argues that the ALJ's hypothetical question to the VE was erroneous because the question was based on an improper RFC determination. Defendant, on the other hand, contends that the ALJ properly determined Plaintiff's RFC based on the all relevant evidence and included only those credible limitations in the hypothetical question. The Court agrees that substantial evidence supports the RFC finding and the resulting question posed to the VE.

With regard to residual functional capacity, "a disability claimant has the burden to establish her RFC." Eichelberger, 390 F.3d at 591 (citation omitted). The ALJ determines a claimant's RFC "'based on all the relevant evidence, including medical records, observations of treating physicians and others, and [claimant's] own description of her limitations.'" Page v. Astrue, 484 F.3d 1040, 1043 (8th Cir. 2007) (quoting Anderson v. Shalala, 51 F.3d 777, 779 (8th Cir. 1995)). RFC is defined as the most that a claimant can still do in a work setting despite claimant's limitations. 20 C.F.R. § 416.945(a)(1).

---

ALJ gave this opinion great evidentiary weight, as it was consistent with the notion that Plaintiff was disabled when using drugs and alcohol. (Tr. 16, 496) The ALJ may consider evidence regarding the severity of a plaintiff's impairment and how it affects his or her ability to work include medical sources such as nurse-practitioners, physicians' assistants, chiropractors, and therapists. 20 C.F.R. § 404.1513(d)(1). Additionally, Dr. Morel did make a similar statement indicating that Plaintiff's mental impairments could be all related to substance abuse. (Tr. 507) Thus, the ALJ properly considered Ms. Jourdan's statement in conjunction with the other supporting evidence in the record. See Moore v. Colvin, No. 4:12CV02170 ERW, 2014 WL 414531, at *14 (E.D. Mo. Feb. 4, 2014) (noting that an ALJ should consider a social worker's observations and opinions within the framework of, *inter alia*, the degree to which her opinions are supported by the evidence).

Plaintiff asserts that the ALJ failed to include Dr. Morel's opinion that the Plaintiff's organizational skills could lead to missed days of work.  (Tr. 414)  However, the Defendant correctly notes that the ALJ did credit Dr. Morel's statement and accounted for Plaintiff's credible limitations.  While Dr. Morel opined that Plaintiff could miss days of work, nothing in her statement or treatment records suggests that Plaintiff would miss work in excess of an employer's absenteeism rules.  Further, her narrative explains her opinion that Plaintiff had a fair ability to demonstrate reliability, indicating that he was not precluded from being reliable in a work setting.  (Tr. 414)  As previously stated, Dr. Morel's opinion supports the finding that Plaintiff could function in a work setting is he did not use substances.  Thus the ALJ did not err in excluding absenteeism from his RFC determination.

Upon careful review of the record, it is apparent that the ALJ determined Plaintiff's RFC after closely examining the record and taking into account all of Plaintiff's credible limitations.  "The ALJ thoroughly analyzed all of the medical and non-medical evidence, performed a legally sufficient analysis of the credibility of plaintiff's subjective allegations, and then formulated a specific RFC that took into account all of plaintiff's limitations caused by his medically determinable impairments that the ALJ found to be credible and supported by the record."  Teal v. Colvin, No. 1:11CV191 SNLJ/FRB, 2013 WL 1363727, at *19 (E.D. Mo. Mar. 18, 2013); see also Eichelberger, 390 F.3d at 591 (citation omitted) ("The ALJ determines a claimant's RFC based on all relevant evidence, including medical records, observations of treating physicians and others, and the claimant's own descriptions of his or her limitations.").

As a result, the hypothetical question posed to the VE was proper.  A hypothetical question to the VE only needs to include those impairments that the ALJ finds are substantially

supported by the entire record.  <u>Martise v. Astrue</u>, 641 F.3d 909, 927 (8th Cir. 2011) (citation

omitted).  Because substantial evidence supports the ALJ's RFC determination, the hypothetical

question was proper, and the VE's answer properly supports the denial of social security

disability benefits.  <u>Id.</u>  Therefore, the undersigned finds that substantial evidence supports the

ALJ's determination that Plaintiff had not been under a disability at any time from the date the

application was filed through the date of the decision.  The decision of the Commissioner should

be affirmed.

 Accordingly,

 **IT IS HEREBY RECOMMENDED** that the final decision of the Commissioner denying social security benefits be **AFFIRMED**.

 The parties are advised that they have fourteen (14) days in which to file written

objections to this Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1), unless an

extension of time for good cause is obtained, and that failure to file timely objections may result

in a waiver of the right to appeal questions of fact.  <u>See Thompson v. Nix</u>, 897 F.2d 356 (8th Cir.

1990).


     <u>  /s/ Terry I. Adelman   </u>
     UNITED STATES MAGISTRATE JUDGE

Dated this <u> 14th </u> day of August, 2014.